

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00490-CV

———————————————

THD S.ᴘ.A., Appellant

V.

Jᴇꜰꜰʀʏ Aʟʟᴇɴ Pᴇɢɢ ᴀɴᴅ Jᴇɴɴɪꜰᴇʀ Pᴇɢɢ, Appellees

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-323665-21

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellees Jeffry and Jennifer Pegg sued Appellant THD S.p.A.—an Italian medical-device manufacturer—for product liability, alleging under a stream-of-commerce theory that THD S.p.A. had sufficient contacts with Texas to confer specific personal jurisdiction. THD S.p.A. filed a special appearance and argued that it sold its medical devices to an Iowa company, THD America, Inc., which independently determined where to sell and distribute those devices. In response, the Peggs pointed to THD S.p.A.'s "Distribution Quality Agreement" with THD America and other evidence they contend demonstrated THD S.p.A.'s intent and purpose to serve the Texas market. The trial court denied THD S.p.A.'s special appearance, and it appealed.

In their opening briefs, both parties argued about another stream-of-commerce special-appearance case that was then pending before the Texas Supreme Court involving a foreign manufacturer that also sold its products to a third-party distributor that then sold the products to Texas customers. *See BRP-Rotax GmbH & Co. KG v. Shaik*, No. 23-0756, 2025 WL 1727903 (Tex. June 20, 2025). THD S.p.A. urged us to await the supreme court's decision before deciding this appeal, which we have done. We hold—in line with *BRP-Rotax*—that because the Peggs did not establish that THD S.p.A. purposefully availed itself of the Texas market—as contrasted with and distinct from THD America's conduct—the trial court erred by denying THD S.p.A.'s special appearance. We will reverse.

## I. Background Facts and Procedural History

When 58-year-old Jeffry Pegg developed Grade III internal hemorrhoids, his primary care physician referred him to surgeon Dr. Jennifer Lowney. Dr. Lowney and Jeffry discussed various treatment options, and Dr. Lowney recommended the "THD procedure," which she allegedly said "was less invasive and had less down time than the hemorrhoidectomy procedure." According to Jeffry, Dr. Lowney did not discuss any risks or complications other than possibly having to repeat the procedure or do a full hemorrhoidectomy if the THD procedure was unsuccessful.

Jeffry had the THD procedure. Immediately afterward, Dr. Lowney reported that Jeffry's hemorrhoids "were successfully treated," but unfortunately, Jeffry's bowel had been perforated during the surgery, and he began to develop many problems. Two days after the surgery, Jeffry went to the emergency room and was admitted to the ICU. He had severe sepsis, pain, and organ failure. Jeffry needed additional surgeries, including an ileostomy surgery. He developed additional complications, including abdominal pain, a hernia at the colostomy site, and acute pulmonary embolisms requiring hospitalization.

Jeffry and his wife, Jennifer, sued Dr. Lowney and others for medical malpractice.[1] Additionally, the Peggs asserted various product-liability claims against THD S.p.A.—an Italian corporation—and THD America—an Iowa-based

---

[1]The Peggs later nonsuited their claims against Dr. Lowney and other named defendants, leaving pending their claims against THD America and THD S.p.A.

corporation—concerning the THD device and procedure. The Peggs alleged that—although headquartered in Italy—THD S.p.A. did "business in the State of Texas by selling and distributing THD medical devices through a worldwide chain of distribution, including selling and distributing THD medical devices including but not limited to the THD Slide One Kit for sale in the State of Texas."

THD America answered, but THD S.p.A. filed a special appearance denying the Peggs' jurisdictional allegations:

> THD S.p.A. never sold or distributed any devices in Texas or the United States. In fact, THD S.p.A. does not conduct business in America, as any American business is conducted solely by the THD American entity, THD America, Inc.—whom [the Peggs] have also named as a [d]efendant and whom [the Peggs] acknowledge is organized under American laws.

THD S.p.A. argued that THD America had independently performed all the conduct that the Peggs alleged as the basis for personal jurisdiction. THD S.p.A. thus argued that because no nexus existed among THD S.p.A., the Peggs' causes of action, and Texas, the trial court should not exercise personal jurisdiction over THD S.p.A.

According to the Peggs, both THD entities—who were jointly represented by the same counsel—inadequately responded to the Peggs' jurisdictional-discovery efforts. But after filing several motions to compel, the Peggs eventually obtained documents and deposed Anne Wegner, THD America's corporate representative and its Director of Finance. We will discuss the Peggs' evidence responsive to the special appearance in greater detail below, but they presented the following: (1) excerpts from

4

Wegner's oral deposition; (2) portions of THD America's discovery responses; (3) a transcript of a hearing on one of the Peggs' motions to compel; (4) THD America's "Org Chart"; (5) marketing materials concerning the THD Doppler® Hemorrhoid System, the THD Slide One Kit, and the THD Doppler procedure; (6) the distribution agreement; and (7) documents on file with the Food and Drug Administration (FDA) concerning THD S.p.A.'s 2008 premarket regulatory filings and THD S.p.A.'s Italian facility in March of 2013.[2]

At the special-appearance hearing, the trial court considered the evidence, heard both sides' arguments, verbally confirmed the Peggs' allegations that THD S.p.A.'s Slide One Kit had been used in Texas during Jeffry's hemorrhoid surgery and had allegedly caused the Peggs' damages, and then denied the special appearance. This appeal ensued.

## II. Discussion

THD S.p.A. raises two issues: (1) it lacked sufficient minimum contacts with Texas and did not purposefully avail itself of the Texas market to justify the trial court's exercise of specific personal jurisdiction over it; and (2) the trial court's exercise of such jurisdiction did not comport with traditional notions of fair play and

---

[2]In reply, THD S.p.A. provided a complete copy of Wegner's deposition transcript, copies of additional regulatory communications, and portions of the Peggs' written discovery and the responses to it.

5

substantial justice. Agreeing with THD S.p.A. on its first issue, we conclude that the trial court erred by denying THD S.p.A.'s special appearance.

## A. Standard of review and applicable law

Because a trial court's authority to exercise personal jurisdiction over a nonresident defendant is a legal question, we review de novo a trial court's decision to grant or deny a special appearance. *See State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 413 (Tex. 2023); *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002). When, as here, the trial court does not issue findings of fact and conclusions of law, we presume that all factual disputes were resolved in favor of the trial court's decision unless they are challenged on appeal. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021).

A Texas court may exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *see also* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045. The Texas long-arm statute broadly permits jurisdiction over a nonresident doing "business in this state" if the nonresident "contracts . . . with a Texas resident and either party is to perform the contract in whole or in part in [Texas]" or "commits a tort in whole or in part in [Texas]." Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1), (2). But this list is not exclusive, and the statute's "broad language extends Texas courts' personal jurisdiction 'as far as the

6

federal constitutional requirements of due process will permit.'" *BMC Software Belg. N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (quoting *U-Anchor Advert., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)).

In determining whether federal-due-process requirements have been met, we rely on precedent from the United States Supreme Court and other federal courts as well as Texas state-court decisions. *BMC Software*, 83 S.W.3d at 795; *TravelJungle v. Am. Airlines, Inc.*, 212 S.W.3d 841, 845–46 (Tex. App.—Fort Worth 2006, no pet.). Federal due process is satisfied when (1) the defendant has established minimum contacts with the state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413, 137 S. Ct. 1549, 1558 (2017); *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016).

A defendant establishes minimum contacts with a state when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958)). Three principles govern our purposeful-availment analysis: (1) only the defendant's contacts with Texas are relevant, not the unilateral activity of another party or third persons; (2) the defendant's acts must be purposeful and not random, isolated, or fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of Texas's jurisdiction so that it impliedly consents to suit here. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*,

7

512 S.W.3d 878, 886 (Tex. 2017) (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)). "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Retamco*, 278 S.W.3d at 338 (quoting *Am. Type Culture Collection*, 83 S.W.3d at 806).

A defendant's contacts can give rise to general or specific jurisdiction, *see Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013), but the Peggs did not rely on general jurisdiction in the trial court and do not argue it on appeal. Accordingly, we need address only the parties' specific-jurisdiction arguments. Specific jurisdiction exists when the cause of action arises from or is related to a defendant's purposeful activities in the state. *Id.* "For a Texas court to exercise specific jurisdiction over a defendant, '(1) the defendant's contact with Texas must be purposeful, and (2) the cause of action must arise from those contacts.'" *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 559 (Tex. 2018) (quoting *Michiana*, 168 S.W.3d at 795). When analyzing specific jurisdiction, our focus is on the relationship among Texas, the defendant, and the litigation. *Moncrief Oil*, 414 S.W.3d at 150.

## B. The stream-of-commerce-plus test in product-liability cases

In product-liability cases, "[t]he stream-of-commerce doctrine is a useful tool to conceptualize minimum contacts." *Luciano*, 625 S.W.3d at 9. "Its utility derives from the recognition that specific jurisdiction over nonresident manufacturers is often

8

premised on 'indirect' sales by independent distributors or agents." *Id.* "But a seller's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product in the stream into an act purposefully directed toward the forum state." *Id.* at 9–10 (cleaned up).

Instead, "Texas courts require additional conduct evincing an intent or purpose to serve the market in the forum state, whether directly or indirectly." *Id.* at 10 (cleaned up). "Evidence of such additional conduct may include advertising in the forum state; soliciting business through salespersons; or creating, controlling, or employing the distribution system that brought the product into the forum state." *Id.* (cleaned up). This additional conduct is known as the "plus factor." *In re Christianson Air Conditioning & Plumbing, LLC*, 639 S.W.3d 671, 679 (Tex. 2022) (orig. proceeding).

With this extant framework, the Texas Supreme Court "br[oke] no new jurisprudential ground" in deciding *BRP-Rotax*, 2025 WL 1727903, at *1, and "faithfully applie[d] the law of personal jurisdiction to the facts of th[e] case," *id.* at *10 (Busby, J., concurring). Its decision—applying the stream-of-commerce-plus test to a fact pattern similar to the case at hand—reiterated the standard for when a Texas court may exercise specific personal jurisdiction over a foreign company whose products are sold or delivered to the Texas market: the "test requires a defendant to *specifically target* Texas; it is not enough that a defendant may foresee some of its products' eventually arriving here." *Id.* at *1; *see also Luciano*, 625 S.W.3d at 9–10. Indeed, such "targeting" must be shown beyond "merely passive awareness of a

9

likelihood—even a substantial likelihood verging on certainty—that products may eventually arrive in our State." *BRP-Rotax*, 2025 WL 1727903, at *5. Applying this test, the court held that the plaintiffs had failed to demonstrate that Rotax (a foreign engine manufacturer) had so targeted Texas based on evidence that it had executed distribution agreements with independent distributors that controlled and were responsible for the distribution system that brought Rotax's engines to Texas. *Id.* at *9–10.

## C. The parties' shifting burdens of proof

The plaintiff and the defendant bear shifting burdens of proof in a challenge to personal jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff must first plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute. *Id.* "To determine whether the plaintiff satisfied its pleading burden and to determine the basis for jurisdiction alleged by the plaintiff, a court considers the allegations in the plaintiff's petition as well as those in its response to the defendant's special appearance." *Graves v. DJO, LLC*, 636 S.W.3d 321, 325 (Tex. App.—Fort Worth 2021, pet. denied) (op. on reh'g) (citing *Am. Refrigeration Co. v. Tranter, Inc.*, No. 02-15-00265-CV, 2016 WL 5957018, at *3 (Tex. App.—Fort Worth Oct. 13, 2016, no pet.) (mem. op.)).

Once the plaintiff has met this burden, the burden generally shifts to the defendant to negate all alleged bases of personal jurisdiction. *Id.* A defendant can negate jurisdiction on either a legal or factual basis:

Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Kelly*, 301 S.W.3d at 659 (footnotes omitted).

## D. Analysis

In its appellate brief, THD S.p.A. does not dispute that the Peggs met their initial pleading burden; instead, it contends that the evidence failed to demonstrate that THD S.p.A. had sufficient minimum contacts to support personal jurisdiction in Texas. We thus focus only on the legal sufficiency of the jurisdictional evidence.[3] *See id.* at 658; *Graves*, 636 S.W.3d at 325.

---

[3]Ordinarily we consider the trial court's exercise of specific jurisdiction on a claim-by-claim basis, but because the Peggs' product-liability claims against THD S.p.A. (for negligence; strict liability by design, manufacturing, and marketing defects; and breach of the implied warranty of merchantability) all arise from the same alleged forum contacts (the Peggs allege their damages were caused by Jeffry's THD procedure), we consider the claims together. *See M & F Worldwide*, 512 S.W.3d at 886 (citing *Moncrief Oil*, 414 S.W.3d at 150).

11

### 1. The special-appearance evidence

#### a. THD S.P.A.'s evidence

As part of THD S.p.A.'s special appearance, CEO Filippo Bastia verified the following factual allegations that THD S.p.A. argued negated the Peggs' personal-jurisdiction allegations:

THD S.p.A. is a foreign (Italian) corporation.

[It] has never done business in Texas.

[It] has never entered into contracts in Texas, nor entered into any contracts that were due to be performed substantially in Texas.

[It] does not and never has maintained a regular place of business in Texas.

[It] is not required to, and does not have, a designated agent for service of process in Texas.

[It] does not have, and has never had, an address or telephone number in Texas.

[It] has never owned, leased, rented, or controlled any real property in Texas.

[It] does not now have, and has never had, employees in Texas.

[It] has never paid taxes in Texas.

#### b. The Peggs' evidence

We summarize as follows the pertinent evidence the Peggs filed in response to THD S.P.A.'s special appearance, including excerpts from Wegner's deposition, the distribution agreement, marketing materials, and regulatory communications:

12

- THD S.p.A. is an Italian corporation that manufactures various medical devices, including the THD Slide One Kit.

- Federal regulatory documents confirm that THD S.p.A. is located in Correggio, Italy and in 2008 engaged a Massachusetts-based regulatory consultant to act as its regulatory contact person for its premarket regulatory filings. In 2013, the FDA issued a warning letter to THD S.p.A. about its Italian-located operations.

- THD America is an Iowa-based corporation that sells THD S.p.A.'s medical devices in the United States under a distribution agreement with THD S.p.A. The distribution agreement defines each party's obligations "to ensure that [THD S.p.A.'s] products . . . are imported, sold and distributed in the United States market."

- Under the distribution agreement, THD America serves as THD S.p.A.'s United States agent, initial importer, and distributor for THD S.p.A.'s products—the medical devices and accessories that THD S.p.A. sells to THD America. THD S.p.A. is solely responsible for ensuring that product labeling is compliant with all "US applicable law" and for all product modifications. THD S.p.A. also maintains the right to audit THD America's facilities. In addition, the distribution agreement requires other actions on THD S.p.A.'s behalf, including specifying how THD America (1) stores and documents THD S.p.A.'s products and (2) communicates about investigations, complaints, and compliance issues so that THD S.p.A. can "evaluate the most appropriate action and/or remedy to be taken."

- After buying THD S.p.A.'s products, THD America sells them to its customers, typically hospitals, doctors, and surgery centers, including those in Texas. THD S.p.A. creates and provides the marketing materials for THD America to provide its customers. The product-data sheet for the THD Slide One Kit (the device at issue in this case) includes THD S.p.A.'s Italian address, Italian phone and fax numbers, and website (www.thdlab.com).

- THD America has 12 salespeople—two of whom are specifically assigned to sales in one of two Texas markets (north and south)—who report to its national sales and marketing director, who in turn reports to its board of directors.

- THD America provides THD S.p.A. with daily sales reports broken down by salesperson. Wegner initially testified that this is so THD S.p.A. "can get a pulse on the demand for the products" and knows how many devices to make

and ship to THD America, but she twice clarified that she does not work for THD S.p.A. and said she "ha[s] no idea what they're using them for" and had based her testimony on "an assumption."

- The various THD companies (including THD America and THD S.p.A.) are owned by the same ownership group. But THD America is not a subsidiary of THD S.p.A., and THD S.p.A. has no ownership interest in THD America.

- THD America's board of directors includes Bastia and Giulliano Spaggiari. Bastia is also the President of THD S.p.A., and Spaggiari is also the Chief Strategy Officer of "all of the" THD companies, including THD S.p.A. and THD America.

- Bastia signed the distribution agreement for THD S.p.A. in his capacity as its CEO; Spaggiari signed the agreement for THD America in his capacity as its Director.

## 2. Application of law to fact

We analyze this evidence to determine whether the Peggs demonstrated that THD S.p.A. specifically targeted Texas. *See BRP-Rotax*, 2025 WL 1727903, at *5. The Peggs focus on three categories of evidence to argue THD S.p.A.'s alleged Texas targeting: (1) the distribution agreement and marketing materials; (2) THD S.p.A.'s receipt and use of THD America's daily sales reports; and (3) the allegedly "share[d] common ownership, common officers, and common board members" between THD America and THD S.p.A. Whether considered individually or collectively, the evidence is legally insufficient to show that THD S.p.A. targeted Texas.

### a. The distribution agreement and marketing materials

The Peggs contend that THD S.p.A. targeted Texas through a distribution system with THD America that it controlled to bring its medical devices into Texas.

14

They point out that THD S.p.A. manufactures medical devices for sale around the world and throughout the United States. For sales in the United States, THD S.p.A. has signed a distribution agreement with exclusive distributor THD America. The Peggs maintain that "THD S.p.A. controls facets of how THD America markets, labels, and distributes THD S.p.A.'s products." And they argue that the distribution agreement and marketing materials that THD S.p.A. provided to THD America, including its Texas salespeople, demonstrate that THD S.p.A. targeted Texas.

But the distribution agreement says nothing about Texas. Rather, it focuses on the entire "United States market." Moreover, none of the distribution agreement's provisions—such as those concerning product labeling, storage, and recalls—have anything to do with targeting the Texas market. Similarly, none of the marketing materials in the record focus on or target Texas doctors, hospitals, or patients. Furthermore, none of the regulatory filings and communications between the FDA and THD S.p.A. mention Texas or any specific contacts with Texas.

In short, the distribution system at issue is distinguishable from those in which foreign manufacturers have specifically targeted Texas through their distribution agreements and marketing materials. *See BRP-Rotax*, 2025 WL 1727903, at *7 (first citing *Spir Star AG v. Kimich*, 310 S.W.3d 868, 874 (Tex. 2010); then citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 436–37 (Tex. 1982); and then citing *Michiana*, 168 S.W.3d at 785). Unlike the distribution-system evidence in these three

listed cases, but similar to that in *BRP-Rotax*, THD S.p.A.'s distribution agreement and marketing materials are aimed at a broad, non-Texas-specific territory. *See id.* at *5.

In *BRP-Rotax*, the supreme court noted that "there [wa]s no evidence that Rotax specifically targeted Texas *at all*," *see id.* at *8, which is the same situation as here. Because "it is only the *defendant's* contacts with the forum that count," the Peggs cannot rely on evidence of THD America's conduct targeting the Texas market. *See id.* at *6 (cleaned up). THD America sold one or more of THD S.p.A.'s medical devices to a Texas customer, but THD S.p.A.'s "[*t*]*argeting Texas* [is] the touchstone" for our specific personal jurisdictional analysis, and we will not "find targeting that does not exist merely because [THD S.p.A.'s devices] ultimately c[ame] to Texas." *Id.* at *7. Here, the Peggs failed to prove that THD S.p.A. created, controlled, or employed a distribution system through its distribution agreement and marketing materials that brought its medical devices into Texas. *See id.* at *4; *Luciano*, 625 S.W.3d at 10.

### b. THD S.p.A.'s knowledge of THD America's sales in Texas

The Peggs next argue that the evidence shows THD S.p.A.'s targeting Texas based on Wegner's testimony that THD America has a specific sales force, including two Texas-focused salespeople, to distribute THD S.p.A.'s medical devices to hospitals, doctors, and surgery centers in Texas. They also point to Wegner's testimony about THD S.p.A.'s receiving daily sales reports from THD America, arguing that THD S.p.A. receives this information so that it can project how many devices to make and ship to THD America. The Peggs contend that "THD S.p.A.

16

expects its products to reach" Texas "hospitals, doctors, and surgery centers" and uses THD America's daily sales reports, including from THD America's Texas-focused salespeople, to know how many devices to make and ship to THD America.

Setting aside the fact that Wegner also testified that she did not work for THD S.p.A., "ha[d] no idea what they're using [the daily sales reports] for," and was basing her testimony on "an assumption," none of her testimony shows that THD S.p.A.—as compared with THD America—was targeting Texas. *See BRP-Rotax*, 2025 WL 1727903, at *6. Rather, it shows that THD S.p.A. was aware that THD America was selling THD S.p.A.'s devices in Texas. *See id.* at *5 (stating that awareness is insufficient).

But even were we to take at face value Wegner's statement that THD S.p.A. used the sales reports to "get a pulse on the demand for the products," such evidence did not demonstrate that THD S.p.A. was specifically targeting Texas as compared to the United States market as a whole. Notably, the Peggs presented no evidence of THD America's sales in Texas in terms of revenue generated or numbers of devices sold. *See, e.g., LG Chem, Ltd. v. Turner*, No. 14-19-00326-CV, 2021 WL 2154075, at *5 (Tex. App.—Houston [14th Dist.] May 27, 2021, no pet.) (mem. op.). Nor did they show what percentage of THD America's revenues were derived from Texas customers as compared to the broader United States market or any evidence that THD S.p.A. used the sales reports or similar sales data to then market or target specific devices for sale in Texas. *See id.* At best, the evidence showed that THD

17

America generally kept THD S.p.A. informed about what products THD America was selling so that THD S.p.A. could make more of those products to supply to THD America.

Ultimately, THD S.p.A.'s "mere awareness, or foreseeability, of [their medical devices'] sale or distribution in Texas alone cannot create minimum contacts sufficient to support personal jurisdiction." *BRP-Rotax*, 2025 WL 1727903, at *4 (cleaned up); *see also Hyundam Indus. Co. v. Swacina*, No. 24-0207, 2025 WL 1717010, at *5 (Tex. June 20, 2025) ("[E]vidence of Hyundai's Elantra sales is legally insufficient to show that Hyundam targeted Texas. We do not consider the unilateral activity of Hyundai, a third party, in assessing Hyundam's contacts with Texas."). Accordingly, Wegner's testimony about THD S.p.A.'s awareness of THD America's daily sales reports did not constitute evidence of THD S.p.A.'s purposeful availment of the privilege of conducting business activities in Texas.

### c. Alleged common ownership, officers and board members

Finally, the Peggs generally assert that "THD S.p.A. and THD America share common ownership, common officers, and common board members." When questioned about THD's "Org Chart," Wegner confirmed that several individuals, such as Bastia and Spaggiari, hold leadership roles in both companies. But as we have detailed, the evidence does not show that THD S.p.A. actually owns or controls THD America. Wegner testified that they were "like sister companies," but she

18

unequivocally testified that (1) THD America is not a subsidiary of THD S.p.A. and (2) THD S.p.A. has no ownership interest in THD America.

Despite broadly asserting alleged common ownership and leaders, the Peggs point to no evidence and make no accompanying argument that THD America is the alter ego of THD S.p.A. or supporting any other theory of jurisdictional veil-piercing to impute THD America's contacts with Texas to THD S.p.A. *See PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 172–76 (Tex. 2007); *Cimiano v. Halberstam*, No. 02-23-00127-CV, 2024 WL 2970847, at \*9–11 (Tex. App.—Fort Worth June 13, 2024, no pet.) (mem. op.). Texas law presumes that THD S.p.A. and THD America are separate legal persons, and the Peggs have presented no evidence to the contrary. *See PHC-Minden, L.P.*, 235 S.W.3d at 173; *Cimiano*, 2024 WL 2970847, at \*9. Because no evidence shows the sort of control that is required to "fuse" them together or to otherwise treat them as one entity, THD America's contacts with Texas cannot be imputed to THD S.p.A. based on THD America's "Org Chart" or Wegner's testimony that they are "like sister companies" and share common leadership. *See PHC-Minden, L.P.*, 235 S.W.3d at 175–76; *Cimiano*, 2024 WL 2970847, at \*11. Such evidence thus failed to show that THD S.p.A. targeted Texas.

In sum, because the Peggs' special-appearance evidence concerning the distribution agreement, marketing materials, regulatory communications, THD S.p.A.'s awareness of THD America's sales, and their common leadership failed to demonstrate that THD S.p.A. specifically targeted and thus purposefully availed itself

of the Texas market, we cannot conclude that THD S.p.A. was subject to the trial court's exercise of specific jurisdiction. *See BRP-Rotax*, 2025 WL 1727903, at *1, *9–10; *Luciano*, 625 S.W.3d at 8. Accordingly, based on the unique evidentiary record before the trial court, *see LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 350 (Tex. 2023), the trial court erred by denying THD S.p.A.'s special appearance. We sustain THD S.p.A.'s first issue.

### III. Conclusion

Having sustained THD S.p.A.'s first issue,[4] we reverse the trial court's order denying THD S.p.A.'s special appearance and render judgment dismissing the Peggs' claims against THD S.p.A. for want of personal jurisdiction. *See* Tex. R. App. P. 43.2(c); *Gordon & Doner, P.A. v. Joros*, 287 S.W.3d 325, 336 (Tex. App.—Fort Worth 2009, no pet.).

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: July 31, 2025

---

[4]Because we have concluded that sufficient minimum contacts were not present for a Texas court to assert personal jurisdiction over THD S.p.A., we need not address its second issue concerning whether the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *See Telcon Servs., LLC v. Primoris T&D Servs., LLC*, No. 02-24-00296-CV, 2025 WL 568529, at *11 (Tex. App.—Fort Worth Feb. 20, 2025, no pet.) (mem. op.); *see generally* Tex. R. App. P. 47.1.